**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thaddeus DRAG, Defendant–Appellant.**

No. 02–2026.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 2003.

Decided Feb. 18, 2003.

Before ROVNER, EVANS, and WILLIAMS, Circuit Judges.

**ORDER**

Thaddeus Drag was convicted after a bench trial of one count of conspiracy to embezzle money from an insurance company, 18 U.S.C. §§ 371, 1033(b), and one substantive count of embezzlement, *id.* § 1033, and sentenced to 3 months' imprisonment, 3 months' home detention with electronic monitoring, 2 years' supervised release, a $5,000 fine, and $200 in special assessments. On appeal Drag contends that the government presented insufficient evidence to convict him and the court abused its discretion in denying his motion for a new trial. We affirm.

In 1997 Sidney Pointer embezzled from his employer, Glenbrook Life and Annuity, a subsidiary of Allstate Insurance Company. Pointer was responsible for generating commission checks payable to insurance brokers and agents. From August to October 1997, he also generated fraudulent checks payable to his friends and acquaintances. The payees would cash the fraudulent checks, keep a portion of the money, and deliver the rest to Pointer. Pointer generated checks for a number of different people, including his roommate Mark Osher and defendant Drag.

Pointer, Osher, and Drag were indicted together, but Pointer and Osher pleaded guilty and were awaiting sentencing when they testified at Drag's trial. Neither Pointer nor Osher made deals with the government in exchange for their testimony. Pointer testified that he and Drag

met through their mutual friend, Kyle Benoit. Pointer and Benoit were roommates, and Benoit worked with Drag as a police officer. When Pointer and Drag were socializing in the fall of 1997, Pointer often used cash in Drag's presence, and he sometimes fielded Drag's questions about his spending habits. Pointer usually alluded to gambling successes until he finally told Drag about his scam. Although he was unsure when the conversation happened, Pointer said that he was at home in his bedroom when he first told Drag about the insurance checks. Pointer explained how the scheme worked, and Drag responded that he had some bills to pay and was interested in participating. Drag planned to repay his mother and brother some money he owed them and then buy a motorcycle. He also devised a story to tell if he got caught—that he thought the check was a settlement for a lawsuit he had pending at the time. Pointer told Drag that he wanted a kickback if he gave Drag a check, but he could not recall Drag's response. At trial Pointer testified about the whole conversation, sometimes not recalling the details. He said that Benoit was present in the bedroom for a portion of the conversation, but Benoit did not testify.

On November 26, 1997, a few days after revealing the scam to Drag, Pointer issued a check payable to Drag for $18,963.65 and delivered it to him. Pointer's testimony was unclear about where the delivery occurred and whether he received his kickback. Drag deposited the check into a newly-opened savings account on December 1, 1997. A few days later, Drag withdrew $5,000 in the form of a cashier's check made out to DesPlaines Yamaha and Suzuki, and he and Pointer purchased motorcycles.

Pointer was caught when a Bloomington, Illinois, bank began investigating one of the checks. He began lying to escape responsibility. He lied to his supervisors at work and to investigators. He lied to cover for Drag, telling investigators several times that Drag never agreed to participate and did not know the check was fraudulent. Pointer said that he had put the check in Drag's mailbox "as a good natured act." After several meetings with investigators, Pointer finally told them that Drag did agree to participate in the scheme and knew the check was fraudulent. Pointer acknowledged at trial that he had lied to investigators about Drag during all of their meetings except the last.

Co-defendant Osher also testified for the government. Osher said that when Pointer realized he'd been caught, he told Osher about everyone involved, including Drag. Osher recalled Drag coming to visit Pointer during the investigation. He overheard six seconds of a conversation between Pointer and Drag in which they discussed Drag's cover-up story about the pending insurance claim. Later Pointer told Osher that he planned to loan Drag money to reimburse the insurance company for the check, hoping that Drag would avoid trouble. Pointer also talked to Osher about trying to collect on that loan.

Special Agent Diane Rivers testified that on key dates during the investigation calls were placed from the phone at the residence shared by Benoit, Osher, and Pointer to Drag's home and pager. Osher had already testified that he called Drag only occasionally. To further narrow down who made the calls to Drag, Agent Rivers presented work records of Pointer, Benoit, and Osher. Agent Rivers also testified that Drag lied when asked what he did with the money after he cashed the check. He had said that he left the money in a bank account for a couple weeks, but records showed that he used some of it to buy a motorcycle.

Drag's defense at trial seemed to be that he never agreed to participate in the scheme and really did think the check was from his lawsuit. Drag did have a pending lawsuit; he had sued an attorney for malpractice. The name of the malpractice insurance carrier was Westport and Coregis, not Glenbrook, but the attorney representing Drag in the malpractice litigation testified that he never told Drag the name of the insurance carrier they were suing.

On appeal Drag argues that his convictions should be overturned because the government presented insufficient evidence. We must uphold a conviction if any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Bolden,* 279 F.3d 498, 501 (7th Cir.2002).

Drag argues that Pointer's testimony was incredible and was the sole evidence against him. Although Pointer's credibility was damaged by his lies, we will not overturn a factfinder's decision to credit a witness's testimony, even if the witness is an admitted lawbreaker and liar, unless it is incredible as a matter of law—meaning impossible under the laws of nature. *United States v. Algee,* 309 F.3d 1011, 1016 (7th Cir.2002); *United States v. Hayes,* 236 F.3d 891, 896 (7th Cir.2001). And Pointer's was not. He pleaded guilty to conspiracy and embezzlement and presented a coherent story about how Drag conspired with him to participate and then aided him in carrying out the scheme. Pointer included details about their initial conversation, Drag's plan for an alibi, his plan to use the money, and their joint efforts to cover up the crime. In announcing his verdicts, the judge explicitly noted Pointer's previous lies and then found his testimony to be credible.

Furthermore, Pointer's testimony was not the sole evidence against Drag. Even if it were, it would be sufficient to sustain the conviction, *see Ticey v. Peters,* 8 F.3d 498, 503 (7th Cir.1993), but the government also presented Osher's testimony, phone records, and evidence that Drag lied when asked what he did with the money after he cashed the check. In total the evidence allows a rational factfinder to conclude that Drag committed both crimes.

Drag also argues on appeal that the court abused its discretion in denying his motion for a new trial. Drag filed a motion for a new trial, Fed.R.Crim.P. 33, seeking an opportunity to present "new evidence" about the phone records and Pointer's credibility. Drag did not proffer any new evidence, however, and instead merely argued that the judge should reweigh the existing evidence differently. The motion did not identify any new evidence, explain why the evidence could not have been discovered earlier, or explain how it would change the outcome, essential information in a Rule 33 motion. *See United States v. Hodges,* 315 F.3d 794, 801 (7th Cir.2003). As such the court did not abuse its discretion in denying the motion.

AFFIRMED.